UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

| | | |
|---|---|---|
| | : | |
| OHIO ENVIRONMENTAL | : | CASE NO. 5:06-CV-742 |
| DEVELOPMENT LIMITED | : | |
| PARTNERSHIP, | : | JUDGE JAMES S. GWIN |
| | : | |
| Plaintiff, | : | ORDER & OPINION |
| | : | [Resolving Docs. 38, 45, 53 & 56] |
| vs. | : | |
| | : | |
| ENVIROTEST SYSTEMS CORP., | : | |
| | : | |
| Defendant. | : | |
| | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On October 20, 2006, Plaintiff Ohio Environmental Development Limited Partnership ("OEDLP") filed a First Amended Complaint alleging (1) breach of contract with regard to maintenance and repair obligations; and (2) breach of contract for failure to obtain consent for assignment. [Doc. 19.] On January 12, 2007, Defendant Envirotest Systems Corp. ("Envirotest") filed a Motion for Summary Judgment. [Doc. 38.] On February 5, 2007, Plaintiff opposed the Motion for Summary Judgment. [Doc. 53.] On February 12, 2007, Defendant filed a Reply in Support of its Motion for Summary Judgment. [Doc. 56.] For the reasons set forth below, the Court **DENIES** Defendant's Motion for Summary Judgment.

## I.  Overview

Defendant moves for summary judgment on numerous grounds. First, Defendant argues

Case No. 5:06-CV-742
Gwin, J.

Plaintiff failed to establish that Defendant breached its maintenance obligations because Plaintiff failed to demonstrate that the problems with the facilities were not attributable to wear and tear.  The Court disagrees and finds Plaintiff's expert, James Watson, sufficiently qualified to give expert opinion as to whether the problems at the E-Check stations were caused by "ordinary wear and tear."

Next, Defendant argues summary judgment is appropriate because Plaintiff failed to establish that the alleged problems at the E-Check stations are not attributable to conditions that existed prior to the 1999 Settlement Agreement, which amended the Master Lease Agreement.  However, the Settlement Agreement provides that "MARTA shall assume . . . all responsibility . . . for performing all Work not yet completed."  As such, the Court finds that Defendant's alleged failure to repair problems which existed at the time of the Settlement Agreement could breach the Master Lease Agreement, as amended by the subsequent Settlement Agreement.

Defendant also argues that Plaintiff failed to establish with reasonable certainty that Defendant's alleged breach diminished the fair market value of the former E-Check stations.  Initially, Defendant contends that Plaintiff's expert, Eric Gardner, improperly relied upon Watson's imprecise calculations detailing the cost to cure deferred maintenance items.  Likewise, Defendant attacks Gardner's own methodology.  The Court finds that Fed. R. Evid. 703 permits Gardner to rely upon the data contained within Watson's report.  The Court also rejects Defendant's assertions that Gardner was required to (1) evaluate the individual repair items listed in the JDS Report in order to determine what the actual effect of each repair would be on the fair market value of the property; and (2) determine whether any alleged repair would have continuing utility for a future end user.  Finally, the Court finds that Plaintiff could properly establish that Defendant's alleged breach diminished the fair market value of the former E-Check stations through "owner-opinion."

-2-

Case No. 5:06-CV-742
Gwin, J.

With regard to the alleged breach of the Master Lease Agreement's anti-assignment clause, Defendant argues that such clauses have generally been interpreted to preclude assignment of contractual obligations, but not contractual rights.  As such, Defendant claims that its assignment of the right of repayment for the Security Deposit does not breach the terms of the Master Lease Agreement.  The Court holds that the assignment in the instant case falls within two independent exceptions to the general rule; and, thus, Defendant's assignment arguably breached the terms of the Master Lease Agreement.  In addition, the Court finds that Plaintiff has established a genuine issue of material fact as to whether Defendant's alleged breach of the anti-assignment clause proximately caused actual damages.

For all of these reasons, the Court **DENIES** Defendant's Motion for Summary Judgment.


## II.  Background

Plaintiff's complaint alleges that Defendant Envirotest improperly maintained thirteen former motor vehicle emissions testing stations ("E-Check stations") that were operated by Envirotest and its predecessor, MARTA Technologies, Ltd. ("MARTA").  Envirotest and MARTA operated the facilities from January 1, 1996 until  December 31, 2005.

The E-Check program was authorized by a 1993 statute, codified within the former version of O.R.C. § 3704.14 (1993).  In 2001, the Ohio General Assembly amended the 1993 statute to terminate the E-Check program upon expiration of the initial 10-year contracts. *See* O.R.C. 3704.143 (2001).  Although the Ohio General Assembly extended the E-Check program in Cleveland and Akron for two years, the Ohio EPA terminated the program in the Cincinnati and Dayton areas, effective December 31, 2005.  The Defendant Envirotest leased facilities in the Cincinnati and

-3-

Case No. 5:06-CV-742
Gwin, J.

Dayton areas.

After the enactment of the E-Check program, the Ohio EPA awarded the contract for services in the Greater Cincinnati area to MARTA.  MARTA entered into an agreement with OEDLP, which financed the construction of thirteen E-Check stations and then leased them back to MARTA under the terms a ten-year Master Lease Agreement, signed September 6, 1994.  For its principle claim, Plaintiff OEDLP says Defendant breached this contract by not properly maintaining the facilities.

The Master Lease Agreement was further amended by a letter from OEDLP to MARTA, also dated September 6, 1994, which stated, "Although Section 49, titled Security Deposit makes reference to a Security Deposit funded by you, it in fact is a loan to Ohio Environmental Development Limited Partnership, from MARTA Technologies, Inc."  The loan "shall be non-recourse to Ohio Environmental Development Limited Partnership; except as secured by the Project."  Finally, the letter established that repayment shall be triggered by the existence of proceeds from the first of either sale of the property or entrance into a new lease for the property.

On February 25, 1999, OEDLP and MARTA entered into a Settlement Agreement that amended the Master Lease Agreement.  The parties agreed that "MARTA shall assume, at its sole cost and expense, all responsibility for all completed Work and for performing all Work not yet completed in a workmanlike manner within a reasonable time period, and MARTA hereby accepts the Facilities in an 'as is' condition."  The Settlement Agreement defined "Work" as "the construction of all or any part of the Facilities, including, but not limited to, all initial construction, punchlist, repair, maintenance and warranty items concerning the Facilities described in Sections 6, 7, 13, and 34.8 of the Master Lease and the 1995 Letter."  In addition, each party

releases, remises, acquits and forever discharges [the other party] of and from any

-4-

Case No. 5:06-CV-742
Gwin, J.

> and all claims, actions, causes of action, suits, debts, compensation, promises, demands, rights, damages, costs, expenses (including attorneys' fees) and losses of every kind and nature whatsoever against [the other party], whether at law or in equity and whether fixed or contingent, arising prior to the Effective Date.

Finally, the parties reaffirmed (1) OEDLP's obligation to repay the Security Deposit; and (2) MARTA's obligation to pay monthly rent and "maintain and repair the Facilities in accordance with the terms of the Master Lease."

On March 1, 1999, Allen Telecom, Inc. ("Allen") sold all of the stock of MARTA to Envirotest, pursuant to a Stock Purchase Agreement. Subsequently, Envirotest and MARTA merged and Envirotest assumed the obligations of MARTA's Master Lease Agreement with OEDLP. On March 1, 1999, MARTA also assigned and transferred to Allen "all of MARTA's right, title and interest in and to the Security Deposit, . . . subject only to OEDLP's right of set off to the limited extent and under the terms and conditions expressly set forth in Section 49 of the Lease." Section 7.9 of the Stock Purchase Agreement between Allen and Envirotest listed the "Security Deposit" as one of Allen's retained assets that was not subject to the Stock Purchase Agreement. Plaintiff alleges that MARTA failed to (1) provide OEDLP with written notice of the assignment; and (2) obtain OEDLP's written consent prior to executing the assignment.

After acquiring MARTA in 1999, Envirotest continued to operate the E-Check program until December 31, 2005, when all motor vehicle emissions testing in the Cincinnati area was terminated by the Ohio EPA. Throughout this period, Envirotest says it responded to all findings made in regular maintenance audits by the Ohio EPA performed of each E-Check station. Envirotest also claims that it was responsive to each audit throughout the tenure of its lease. By December 31, 2005, when the Ohio EPA terminated the E-Check program in Cincinnati, Envirotest had paid

Case No. 5:06-CV-742
Gwin, J.

OEDLP all of the rent and other management fees owed under the Master Lease Agreement. Envirotest also conducted a final audit and inspection with a representative of OEDLP.

In January 2006, Envirotest ceased all use of the E-Check stations and control of the stations reverted to OEDLP.  OEDLP has advertised that the E-Check stations are available for "lease or build to suit" in an "as is/where is" condition.  Currently, OEDLP has successfully leased three former E-Check stations.

On March 31, 2006, Allen sued OEDLP for its refusal to repay the "Security Deposit."  On that same day, OEDLP sued Envirotest in the instant case alleging breach of contract for failure to uphold its duty to maintain and repair the facilities as required by the Master Lease Agreement.

### III.  Legal Standards & Analysis

*A.  Summary Judgment*

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case.  *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will affect the outcome of the lawsuit.  *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

Case No. 5:06-CV-742
Gwin, J.

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts.  *Id.* at 586.  Nor can the nonmoving party "rest upon the mere allegations or denials of the adverse party's pleading."  FED. R. CIV. P. 56(e).

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322.  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).


*B.  Plaintiff's Burden to Prove Alleged Problems Were Not Attributable to Ordinary Wear and Tear*

1.  Legal Standard

"To prove a breach of contract under Ohio law, the following elements must be established:

-7-

Case No. 5:06-CV-742
Gwin, J.

1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and

4) damage or loss to the plaintiff." *Res. Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F.

Supp. 2d 763, 769 (N.D. Ohio 2004). The construction of written contracts is a matter of law to be

determined by the Court. *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241 (1978). "In any

dispute over a lease of real property, courts must endeavor to effectuate the intentions of the parties

as nearly as is ascertainable from the language of the written agreement." *Truetried Serv. Co. v.*

*Hager*, 118 Ohio App. 3d 78, 83 (Ohio Ct. App. 1997) (citing *F & R Enters. v. Phillips*, 1990 Ohio

App. LEXIS 2030 (Ohio Ct. App. 1990)).

> With regard to the Master Lease Agreement:
>
> The usual and ordinary meaning ascribed to the phrase 'wear and tear' is that
> deterioration of condition or depreciation in value attributable to normal and
> reasonable use of an object. What is normal and reasonable use depends upon the
> service for which the object is intended. Other factors useful in defining normal
> wear and tear include the age of the object and any applicable guidelines or practices
> in the particular industry.

*Otto Candies, Inc. v. McDermott Int'l, Inc.*, 600 F. Supp. 1334, 1343 (E.D. La. 1985) (citations

omitted). "The 'reasonable wear and tear' excepted in the contract is meant to refer to wear and tear

which occurs notwithstanding routine maintenance." *Atlas S. Corp. v. Houston Marine Services,*

*Inc.* 1993 WL 192870, *1 (E.D. La. 1993). "The most reasonable and logical interpretation of the

exception for obsolescence and ordinary wear and tear is simply that the tenant is not required to

keep the premises in like-new or nearly new condition, but rather is required merely to keep it

serviceable and in good repair." *Capitol Funds, Inc. v. Arlen Realty, Inc.*, 755 F.2d 1544, 1549 (11th

Cir. 1985).

Case No. 5:06-CV-742
Gwin, J.

2.  Master Lease Agreement Provisions

With regard to the maintenance and repair of the E-Check stations, Section 13.1 of the

Master Lease Agreement describes the parties' agreement relative to maintenance and repair:

> Subject to Landlord's obligations hereunder, Tenant at Tenant's sole expense, will
> promptly keep the Leased Premises, as now or hereafter constituted, with all
> improvements now or hereafter located thereon, and the sidewalks, parking lots,
> driveways and curbs, if any, adjoining the Leased Premises in good condition,
> ordinary wear and tear excepted.  Tenant will make all necessary repairs thereto,
> interior and exterior, structural and nonstructural, ordinary and extraordinary, and
> unforeseen and foreseen.  This duty shall also extend to and include, but not be
> limited to, maintenance and repair of the grounds, landscaping and buildings and
> other improvements, including, the roof, all installed electrical and plumbing
> equipment, to include, without limitation, sewage treatment facilities, if any.  When
> used in this Lease, the term "repairs" shall include, all necessary replacements,
> renewals, alterations, additions, and betterments to include without limitation,
> replacing any improvements or any part thereof now or hereafter on the Leased
> Premises in the event of the destruction thereof.

Likewise, with regard to MARTA's duty to surrender, Section 26.1 of the Master Lease

Agreement establishes that "Tenant shall surrender to Landlord the possession of the Leased

Premises and all improvements now or hereafter located thereon.  Tenant shall leave the surrendered

Leased Premises and said improvements in good and broom-clean condition, reasonable wear and

tear excepted."

3.  James Watson's Qualifications

Defendant initially argues that "determination of whether the conditions at the Facilities arise

from ordinary wear and tear must be defined by a witness who has actual or specialized knowledge

of the normal and intended use of the E-Check facility and the 'applicable guidelines and practices'

of this particular industry (motor vehicle emissions testing)."  Given that Plaintiff's expert, James

-9-

Case No. 5:06-CV-742
Gwin, J.

Watson, is an architect who has no specialized knowledge of the normal and intended use of E-Check stations, Defendant contends that his expert testimony is not sufficient to establish a breach of the Master Lease Agreement as a matter of law.

The Court disagrees and finds Watson sufficiently qualified to give expert opinion as to whether the problems at the E-Check stations were caused by "ordinary wear and tear."  Watson's day-to-day duties as Vice President of JDS Consultants, Inc. include "inspecting existing properties as to their existing conditions and to identify and estimate the value of deferred maintenance issues." Watson declared, "The E-Check Properties can be considered industrial properties which include an office element.  They are not unique in their design, construction or use in any material way." Over the course of twenty years, Watson inspected hundreds of commercial, industrial and office properties, including warehouses, distribution centers, parking garages, and auto and truck repair centers.  These facilities share numerous common features with E-Check stations including frequently used rollup doors, high-volume traffic, and exposure to the elements.

Additionally, whereas specialized knowledge of the "applicable guidelines and practices" of a particular industry is one factor that may be useful in weighing testimony on "ordinary wear and tear," it is not essential.  Watson has extensive experience identifying and estimating the value of deferred maintenance issues in a variety of facilities that are functionally similar to E-Check stations.  As such, Watson is qualified to offer an expert opinion as to whether Defendant breached the Master Lease Agreement.


4.  "Ordinary Wear and Tear" Standard

Defendant also argues that Watson applied an incorrect legal standard when determining

-10-

Case No. 5:06-CV-742
Gwin, J.

whether and to what extent Defendant breached the Master Lease Agreement. Specifically,

Defendant suggests that Watson applied a much higher legal standard that the E-Check stations

should have been kept in "like-new or nearly new conditions," instead of focusing upon whether the

facilities were serviceable and functional. Additionally, Defendant argues Watson failed to evaluate

whether any specific repairs necessarily had any future utility to the next occupant of the facility.

As Watson applied the incorrect legal standard throughout his evaluation, Defendant claims his

expert opinion is insufficient to establish a genuine issue of material fact as to whether Defendant

breached the Master Lease Agreement.

Watson's deposition explicitly contradicts Defendant's contention. When asked whether he

believed the conditions at the E-Check stations should be restored to a condition comparable to that

at the onset of the lease, Watson repeatedly states, "Subject to normal wear and tear."[1/]

-------------------

[1/] "Q: . . . what standard do you apply when you're examining the buildings? . . . When you are listing an item that needs to be repaired, okay, you are saying that that item should be restored to a condition comparable to that at the onset of the lease; is that a fair statement?

A: Subject to normal wear and tear.

Q: What's that mean?

A: A ten-year-old building that has been properly maintained over that period will have few defects. It may have some bruises, but it has few defects. It has evidence of proper maintenance. If I observe a condition that indicates improper maintenance, unskilled maintenance, unrepaired abuse, an unmaintained condition, then that does not meet my criteria for what I would expect to see of a ten-year-old building that had normal wear and tear as it first took use.

Q: And then when you're discussing what repair would be necessary, you're determining a repair necessary to return it to a condition comparable to the onset of the lease?
 . . .
A: Subject to wear and tear. If the abuse has been sufficient that a major effort is necessary, then you can't get back to ten years with normal wear and tear. You go back to the onset of the lease. For instance, in the office areas where abuse and lack of maintenance is extreme in the sites, other than the three that have been partly renovated by current tenants, the condition of the building is so far away from where it should be at year ten, subject to wear and tear, that you can't put to it a point of ten years with wear and tear. You have to go back to a point of closer to what it was originally. Repaint it, re-floor it, retile the ceiling, this sort of thing, because you can't go back halfway, the conditions of it being so bad as they were observed."

Case No. 5:06-CV-742
Gwin, J.

> Watson also declares:
>
> As used in the architectural and construction industry, the term 'ordinary wear and tear' or 'normal wear and tear' refers to the inevitable deterioration of the condition of a given building that is otherwise properly maintained, but does not include conditions arising out of deferred maintenance. In other words, ordinary wear and tear presumes an appropriate level of maintenance.

The defendant seems to concur with this definition, stating "Envirotest is not contending, as OEDLP suggests, that the 'ordinary wear and tear' exception somehow relieved Envirotest of the obligation to perform the maintenance and repairs necessary to keep the Facilities in good condition during the operation of the E-Check program." Therefore, the proper legal inquiry is not simply whether the E-Check stations were serviceable or functional. Rather, the fact-finder must evaluate whether the E-Check stations were left in good condition, absent the inevitable deterioration of the condition of a given building that is otherwise properly maintained.

Additionally, it is impossible to know whether any particular suggested repair will have utility for a future occupant of an E-Check station. As such, Watson could not be reasonably expected to opine on this topic. Instead, Watson described how "the conditions after quite a few years" in similar automotive service areas "are nowhere near the condition that we experienced" at the E-Check station. Rather, any attempt at maintenance in some instances was "so sloppy that there is no way to reasonably get back to that mystical ten years less wear and tear. It has been so abused."

Whether Watson correctly categorized particular repairs as necessary to maintain the building in good condition absent the inevitable deterioration that occurs despite proper maintenance is a question for the jury. However, Watson's expert opinion does establish a genuine issue of material fact as to whether Defendant breached the Master Lease Agreement sufficient to defeat

-12-

Case No. 5:06-CV-742
Gwin, J.

Defendant's proffered grounds for summary judgment on this issue.


*C.  Plaintiff's Burden to Prove Alleged Problems Did Not Exist Prior to the Settlement Agreement*

In the alternative, Defendant argues that summary judgment is appropriate because Plaintiff fails to give sufficient evidence that the alleged problems at the E-Check stations are not attributable to conditions that existed prior to the 1999 Settlement Agreement.  Defendant contends that the Settlement Agreement "expressly released MARTA and its successors from any liability for alleged claims or damages arising before February 1999."  Thus, "it is incumbent upon Plaintiff to establish that a condition did not arise from the original design or construction or was not otherwise in existence before February 1999."

However, Plaintiff properly notes that "[u]nder the Settlement Agreement, MARTA and ultimately Envirotest, . . . obligated itself to maintain and repair all problems, including those existing at the time of the Agreement."  Specifically, the Settlement Agreement states that "MARTA shall assume, at its sole cost and expense, all responsibility for all completed Work and for performing all Work not yet completed in a workmanlike manner within a reasonable time period, and MARTA hereby accepts the Facilities in an 'as is' condition."  The Settlement Agreement defined "Work" as "the construction of all or any part of the Facilities, including, but not limited to, all initial construction, punchlist, repair, maintenance and warranty items concerning the Facilities described in Sections 6, 7, 13, and 34.8 of the Master Lease and the 1995 Letter."

As such, Defendant's alleged "failure to maintain or repair problems which existed at the time of the Settlement Agreement and which continued to exist (and further deteriorate) until the properties were turned over" would constitute a breach of the Master Lease Agreement as amended

-13-

Case No. 5:06-CV-742
Gwin, J.

by the subsequent Settlement Agreement.  Therefore, Watson's failure to delineate whether particular defects were attributable to conditions that existed prior to the Settlement Agreement is not an appropriate basis for summary judgment.


*D.  Measuring Damages Resulting from Breach of Contract*

1.  Legal Standard

> With regard to damages:

> As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort.  The damages awarded for a breach of contract should place the injured party in as good a position as it would have been but for the breach.  Such compensatory damages, often termed 'expectation damages,' are limited to actual loss, which loss must be established with reasonable certainty.

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 144 (Ohio Ct. App. 1996) (citations omitted).

> "The measure of damages in cases of temporary injury to real property is the cost of repairs unless the cost of repairs exceeds the diminution in market value after the injury, in which case the diminution in value is the proper measure."  *Cavalier v. N. Akron Auto Paint Shops, Inc.*, 1984 WL 3994, *2 (Ohio App. Ct. 1984).  The Sixth Circuit described the Ohio rule governing actions by lessors for damage to leased premises in excess of ordinary wear and tear at the time of the surrender of the property as:

> the difference between the market value the property would have had at the time of the surrender of possession by the defendant, if it had remained in the condition in which it was at the time possession was taken by the lessee, and its market value in the condition in which it was placed by the action of the defendant during the tenancy.  *Blosser v. Enderlin*, 113 Ohio St. 121, 148 N.E. 393.  The plaintiff is

-14-

Case No. 5:06-CV-742
Gwin, J.

> entitled to recover such amount as will fairly and reasonably compensate him for the damage done as provided by the terms of the lease.  The cost of repairs may be admitted in evidence but only for the purpose of assisting in arriving at the fair and market value of the real estate at the times under consideration.

*Middendorf v. Fuqua Indus., Inc.*, 623 F.2d 13, 18-19 (6th Cir. 1980) (quoting *Sopronyi v. Asztalos*, 101 N.E.2d 161 (Ohio Ct. App. 1949)).

2.  Testimony of Eric Gardner

"The measure of damages in cases of temporary injury to real property is the cost of repairs unless the cost of repairs exceeds the diminution in market value after the injury, in which case the diminution in value is the proper measure."  *Cavalier v. N. Akron Auto Paint Shops, Inc.*, 1984 WL 3994, *2 (Ohio App. Ct. 1984).  Defendant argues that Plaintiff failed to satisfy its burden to establish with reasonable certainty that the alleged breach has diminished the fair market value of the properties.

Initially, Defendant argues that because Plaintiff's expert, Eric Gardner, relied upon Watson's repair estimates, which Gardner incorrectly assumed to be accurate and supportable, Gardner's own calculations based upon a percentage of Watson's calculations are fatally flawed. Defendant contends that Watson's calculations were based upon a preliminary estimate of "probable" costs and did not determine the actual costs of repair to a "reasonable degree of certainty," as required by Ohio law.

Additionally, Defendant contends Gardner failed to evaluate (1) any of the individual repair items listed in the JDS Report in order to determine what the actual effect of each repair would be on the fair market value of the property; and (2) whether any alleged repair would have continuing

-15-

Case No. 5:06-CV-742
Gwin, J.

utility for a future end user who must convert the former E-Check station to an alternative use.

Defendant also alleges that OEDLP was able to achieve a fair market rent when it re-leased three

of the former E-Check stations in "as is" condition.  As a result, Defendant argues that Plaintiff has

failed to satisfy its burden to establish with reasonable certainty that the alleged breach has

diminished the fair market value of the properties.

These arguments are not well taken.  First, with regard to Gardner's reliance upon Watson's

calculations, an "expert is free to give his opinion relying upon the types of data an expert would

normally use in forming an opinion in his area of expertise."  *Mannino*, 650 F.2d at 851.  If an

expert's consultation of another expert's opinion is a resource "reasonably relied upon by experts

in the particular field in forming opinions or inferences upon the subject, the facts or data need not

be admissible in evidence in order for the opinion or inference to be admitted."  FED. R. EVID. 703.

Similarly, the Sixth Circuit has held that "[g]reat liberality is allowed the expert in determining the

basis of his opinions under Rule 703."  *Mannino*, 650 F. 2d at 853.

The Court finds that Watson's calculations are precisely the source of data "reasonably relied

upon" by experts in Gardner's field of appraisal in forming opinions on the diminution of the market

value of property resulting from deferred maintenance.  Initially, Watson's report determined the

actual costs of repair to a reasonable degree of certainty as required by Ohio law.  Reasonable

certainty does not mean absolute certainty, but rather requires only proof of "that degree of certainty

of which the nature of the case admits."  *Bemmes v. Pub. Employees Ret. Sys.*, Ohio App. 3d 782,

789 (Ohio Ct. App. 1995).  In the instant case, Watson personally observed the conditions at each

of the E-Check stations, employed a methodology that is standard in the industry, and relied upon

over twenty years of personal experience in identifying and estimating the value of deferred

Case No. 5:06-CV-742
Gwin, J.

maintenance issues.  Whereas Defendant may further attack Watson's methodology or the precision of his calculations at trial, such arguments shall implicate the weight of the evidence, not its admissibility.

Furthermore, even if Watson's calculations were inadmissible, Fed. R. Evid. 703 would still allow Gardner to rely upon them in forming his own expert opinion.  Consistent with the Uniform Standards of Professional Appraisal Practice, Gardner explicitly stated his reliance upon the "extraordinary assumption" that Watson's report was accurate and supportable.  Throughout his practice, Gardner has regularly relied upon the types of information contained in Watson's report. Likewise, Gardner is intimately familiar with the Cincinnati industrial real estate market, and maintains a detailed understanding of how deferred maintenance affects value and marketability in the area.  As opposed to blindly accepting Watson's calculations, Gardner satisfied himself that Watson's findings were consistent with Gardner's own personal observations of the thirteen E-Check stations.  As such, Fed. R. Evid. 703 permits Gardner's reliance upon Watson's expert report.

Given Gardner's appropriate reliance upon Watson's calculations, Gardner was not required to evaluate any of the individual repair items listed in the JDS Report in order to determine what the actual effect of each repair would be on the fair market value of the property.  Instead, Gardner (1) personally inspected each former E-Check station; (2) developed a valuation for each property under the assumption that the properties were in good repair; (3) identified and reviewed Watson's cost-to-cure estimates to ensure they coincided with his own evaluation; (4) spoke with two experienced, industrial brokers familiar with how market values in the Cincinnati area would be impacted by investing Watson's proposed cost-to-cure figures; and (5) developed a percentage cost recoupment of investing in the deferred maintenance items while considering the general market impact of

-17-

Case No. 5:06-CV-742
Gwin, J.

deferred maintenance items on each particular property and the external obsolescence of properties

in different neighborhoods.  Ultimately, Gardner projected 25 percent of cost-to-cure would be

recouped from properties located in neighborhoods suffering from greater external obsolescence,

and 40 percent would be recouped from properties located in neighborhoods with less external

obsolescence.

The Court rejects Defendant's assertion that Gardner was required to determine whether any

alleged repair would have continuing utility for a future end user.  Neither Gardner nor anyone else

can predict who the next user of each E-Check facility will be, let alone the industry such user will

occupy or the particular needs and preferences of that new user within a given industry.  If Gardner

would have attempted to determine the future utility of any particular repair item to this amorphous

new user, such an exercise would have been pure speculation.  Once again, reasonable certainty does

not mean absolute certainty, nor does this standard require hazarding guesses as to figures that are

impossible to discern at the present moment.  As such, Gardner's Summary of Opinion of Market

Values establishes damages to a "reasonable degree of certainty," as required by Ohio law.

Finally, whether OEDLP was able to achieve a fair market rent when it re-leased three of the

former E-Check stations in "as is" condition has no bearing on whether the alleged failure to

properly maintain the E-Check stations diminished the value of the properties.  Even granting

Defendant's assertion that the present rent of the three re-leased facilities represents a fair market

value for the premises in "as is" condition, it is quite possible that OEDLP could have garnered more

rent if the facilities had been properly maintained.


3.  Testimony of Mary and Rustom Khouri

-18-

Case No. 5:06-CV-742
Gwin, J.

A. LEGAL STANDARD

With regard to expert testimony, Fed. R. Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or
inference may be those perceived by or made known to the expert at or before the
hearing.  If of a type reasonably relied upon by experts in the particular field in
forming opinions or inferences upon the subject, the facts or data need not be
admissible in evidence in order for the opinion or inference to be admitted.

The Sixth Circuit has ruled that:

The purpose of Rule 703 is to make available to the expert all of the kinds of things
that an expert would normally rely upon in forming an opinion, without requiring
that these be admissible in evidence.  Under the Rule, the expert is free to give his
opinion relying upon the types of data an expert would normally use in forming an
opinion in his area of expertise.

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).  As such, "[u]nder Rule 703, an

expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."

*Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004).  "Great liberality is

allowed the expert in determining the basis of his opinions under Rule 703.  Whether an opinion

should be accepted is not for the trial judge.  That is for the finder of fact."  *Mannino*, 650 F.2d at

853.

With regard to the admissibility of lay testimony as to the value of property:

Evid. R. 701 permits a lay witness to testify in the form of an opinion if the opinion
is 'rationally based on the perception of the witness' and is 'helpful to a clear
understanding of his testimony or the determination of a fact in issue.'  The Staff
Note to the rule states that 'the rule is in accordance with Ohio law as it had
developed prior to the adoption of the Rules of Evidence.'  Ohio courts have long
recognized what has come to be known as the 'owner-opinion rule.'  Under the
owner-opinion rule, an owner of real property, by virtue of his ownership and
without qualification as an expert, is competent to testify to his property's fair market
value.  The rule is based on the presumption that 'the owner of real estate possesses
sufficient acquaintance with it to estimate the value of the property, and his estimate
is therefore received although his knowledge on the subject is not such as would

-19-

Case No. 5:06-CV-742
Gwin, J.

      qualify him to testify if he were not the owner.'

*City of Cincinnati v. Banks*, 143 Ohio App. 3d 272, 291 (Ohio Ct. App. 2001) (citations omitted);

*see also Tokles & Son, Inc. v. Midwestern Indem. Co.*, 65 Ohio St. 3d 621 (1992); *Smith v. Padgett*,

32 Ohio St. 3d 344, 347 (1987).  An owner may also testify as to the value of his or her property

both before and after a particular injuring event.  *See Leppla v. Sprintcom, Inc.*, 156 Ohio App. 3d

498, 509 (Ohio Ct. App. 2004); *Rospert v. Old Fort Mills, Inc.*, 81 Ohio App. 241, 245 (Ohio Ct.

App. 1947).  Likewise, an owner may reference factors such as "original cost, replacement cost,

salvage value, fair market value at the time of the accident and value of the property to the owner.

Nevertheless, Ohio courts do not consider an owner's opinion alone sufficient, and have not upheld

verdicts when the only evidence of value is the owner's opinion."  *Igo v. Coachmen Indus., Inc.*, 938

F.2d 650, 657 (6th Cir. 1991).  "The weight to be accorded the owner's opinion concerning his

property's value is a matter to be determined by the trier of fact."  *Banks*, 143 Ohio App. 3d at 292.

      In the instant case, "[a]n officer, or shareholder of a closely held corporation who has

acquired knowledge of the corporate property tantamount to that of an owner by virtue of having

purchased, or dealt with, the property as if he were the individual owner may testify as to its value."

*Tokles*, 65 Ohio St. 3d at 627.  "Ownership may involve an intimate knowledge of the nature,

quality, cost, and condition of the property.  However, ownership of property may in other cases

constitute very little, if any, qualification to form an opinion as to the value of the property."  *Id.* at

626.  "[A]n officer or shareholder of a corporation is not presumed to be familiar with corporate

property solely by virtue of occupying a corporate office or owning stock in the corporation."  *Id.*

Rather,

      the witness must show that he is familiar with the property itself and that he has

-20-

Case No. 5:06-CV-742
Gwin, J.

> current sufficient knowledge of the value of the item by, for example, demonstrating
> a firsthand knowledge of the characteristics of the property, its actual and potential
> uses and its condition or by showing other meaningful experience in dealing with the
> item.

*Id.* at 627.  "Whether such a witness may give an opinion as to value without qualifying as an expert

is a preliminary question to be decided by the trial judge, who shall consider all the facts and

circumstances relating to the individual or corporate ownership."  *Id.*


B. ADMISSIBILITY

In response to Defendant's assertion that Plaintiff failed to establish actual damages to a "reasonable

degree of certainty," Plaintiff argues that Ohio's "owner-opinion" rule permits Mary and Rustom

Khouri to testify regarding the value of the E-Check stations before and after Defendant's

occupancy.  In order for a corporate officer to properly testify as to the value of his or her property,

> the witness must show that he is familiar with the property itself and that he has
> current sufficient knowledge of the value of the item by, for example, demonstrating
> a firsthand knowledge of the characteristics of the property, its actual and potential
> uses and its condition or by showing other meaningful experience in dealing with the
> item.

*Tokles*, 65 Ohio St. 3d at 627.

In the instant case, Mary Khouri is both a limited partner of OEDLP and the sole shareholder

of Ohio Environmental Development Corporation, which is the general partner of OEDLP.  As such,

she qualifies as an "owner" of the E-Check stations under Ohio law.  She also has extensive

familiarity with the E-Check facilities.  Mary Khouri was instrumental in obtaining the financing

for each of the thirteen properties.  In conjunction with her efforts to obtain a construction loan and

a permanent loan for the properties, Mary Khouri had the properties appraised twice between 1994

Case No. 5:06-CV-742
Gwin, J.

and 1996.  Her company's total investment in the properties exceeds several million dollars.  Since

Defendant's abandonment of the facilities, Mary Khouri alleges she has been forced to pay

significant costs associated with maintaining the property, attracting new tenants for re-leasing

the premises and defending the lawsuit filed by Allen for recovery of the Security Deposit.

Additionally, Rustom Khouri testified in detail with regard to the damages incurred by

OEDLP as a result of Defendant's failure to properly maintain the E-Check stations, including lost

income, taxes, maintenance costs, overhead, internal overhead, marketing fees, security

maintenance, structural damage and legal fees.  Likewise, Rustom Khouri described OEDLP's

attempts to re-lease the facilities, including assembling marketing packages, contacting local

brokers, developing signage, meeting with tenant prospects, and designing rent abatements and other

incentives to mitigate damage and encourage re-leasing of the properties.  He also personally

inspected the E-Check facilities and noted with particularity the wide variety of property damaged

by the alleged deferred maintenance of the defendant.  In formulating his opinions, Rustom relied

upon approximately twenty years of building and developing experience.

As such, the Khouris possess extensive familiarity with the characteristics, conditions and

actual and potential uses of the former E-Check stations sufficient to warrant the admissibility of

their testimony as to the diminution of the property value resulting from Defendant's alleged breach

of contract.

Defendant argues that Mary Khouri lacks sufficient familiarity with the conditions of the E-

Check stations because she failed to visit the facilities after the Master Lease Agreement expired.

This position improperly neglects the wealth of information available to Mary Khouri throughout

the term of the lease and upon its expiration, including two appraisals conducted in conjunction with

-22-

Case No. 5:06-CV-742
Gwin, J.

the initial financing and construction of the properties; Watson and Gardner's evaluations; OEDLP's

financial records detailing the costs associated with mitigating damages and retaining all remaining

property value; OEDLP's current attempts to obtain a fair market value when re-leasing the

properties; knowledge shared among her business associates; and any additional information

unearthed in discovery relating to the Allen litigation or the instant case.  As such, Defendant's

suggestion that Mary Khouri lacks sufficient familiarity with the conditions of the former E-Check

stations does not persuade.

Likewise, the "owner-opinion" potentially provided by the Khouris need not stand alone.

Rather, as addressed *supra*, the Khouris' testimony may bolster the expert opinions of Watson and

Gardner to further establish actual damages to a "reasonable degree of certainty," as required by

Ohio law.  Therefore, Defendant has failed to provide adequate grounds for summary judgment with

regard to this issue.

*E.  Breach of the Anti-Assignment Clause*

1.  Legal Standard

The Supreme Court of Ohio recently noted:

It is long-standing tradition in the common law that all contract rights may be
assigned except under three conditions.  First, if there is clear contractual language
prohibiting assignment, an assignment will not be enforced.  Second, an assignment
must not materially change the duty of the obligor, materially increase the insurer's
burden or risk under the contract, materially impair the insurer's chance of securing
a return on performance, or materially reduce the contract's value.  Third, the
assignment will not be valid if it is forbidden by statute or by public policy.

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St. 3d 482, 488 (internal citations

omitted); *see also U.S. Indus. v. Touche Ross & Co.*, 854 F.2d 1223, 1234 (10th Cir. 1988) ("So long

-23-

Case No. 5:06-CV-742
Gwin, J.

as the assignment does not interfere with the parties' rights to performance, the assignment should

be permitted."); RESTATEMENT (SECOND) OF CONTRACTS § 317(2) (1981). Likewise, Section 322(1)

states that "[u]nless the circumstances indicate the contrary, a contract term prohibiting assignment

of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty

or condition." RESTATEMENT (SECOND) OF CONTRACTS § 322(1) (1981). *See also Touche Ross &*

*Co.*, 854 F.2d at 234 ("A traditional assignment clause, the cases suggest, acts to limit the right to

assign rights and privileges relating to performance of the contract. It does not act to limit the right

to recover damages arising from the contract."); *Cedar Point Apartments, Ltd. v. Cedar Point Inv.*

*Corp.*, 693 F.2d 748, 753 (8th Cir. 1982) ("unless intent to the contrary is shown, a contractual

prohibition against 'assignment of the contract' is presumed as a matter of law to refer only to

delegation of contractual duties, not assignment of rights"); *Charles L. Bowman & Co. v. Erwin*, 468

F.2d 1293, 1297-98 (5th Cir. 1972) ("Although the prohibition of assignment may be so clearly

stated to be applicable to the right as well as the duty as to preclude another interpretation, it will

generally be found to relate only to the delegation of performance by the [promisor].") (citing 3

SAMUEL WILLISTON, THE LAW OF CONTRACTS § 422, at 138-39 (3d ed. 1960)).

However, the Commentary to Section 322 of the Second Restatement of Contracts clarifies

that "the policy which limits the validity of restraints on alienation has been applied to the

construction of contractual terms open to two or more possible constructions." "Such a provision

must first be interpreted to determine how the parties intended it to apply to the facts of the case."

9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 872 (1951). Specifically, the Sixth Circuit has

cautioned that the rules of interpretation governing anti-assignment provisions "do not override

express statements of the will of the parties. If the contract shows an intent by the parties to limit

Case No. 5:06-CV-742
Gwin, J.

both delegations of duties and assignment of rights, and specifically states who is bound by the assignment prohibition, then the interpretive default rules are inapplicable." *Riley v. Hewlett-Packard Co.*, 36 Fed. Appx. 194, 196 (6th Cir. 2002). *See also* 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS SUPP. § 872 (1951) ("such rules do not override the express intention of parties to limit both the delegation of duties and the assignment of rights").

2. Master Lease Agreement Provisions

The Master Lease Agreement contains a provision regarding assignment of the Lease. Section 17.1 states:

> Tenant agrees not to assign this Lease, in whole or in part, nor to sublease all or any part of the Leased Premises or any improvements now or hereafter located thereon without the prior written consent of Landlord . . . The terms of any assignment or sublease which may be made or attempted to be made in a manner or upon conditions other than those above specified shall be null and void.

Finally, Section 49 of the Master Lease Agreement addressed a "Security Deposit" provided by MARTA to OEDLP in the amount of $1,325,000. Section 49.2 established that "The Security Deposit shall be returned to Tenant upon the expiration of the Term or the sooner termination of this Lease." Section 49.3 defined which of MARTA's obligations were being secured:

> The Security Deposit shall secure only Tenant's obligations to pay Rent during the Term and shall not secure any other obligation of Tenant hereunder . . . Landlord shall be entitled to apply the Security Deposit against Tenant's Rent obligation only upon obtaining from a court of competent jurisdiction a final adjudication entitling Landlord to the Rent that Tenant has failed to pay subject to all rights of Tenant hereunder (including Tenant's rights of set-off) or pursuant to law.

Section 49.4 establishes that "Tenant's interest in and ownership of the Security Deposit shall be secured by all of Landlord's right, title and interest in and to the Project and this Lease." MARTA

-25-

Case No. 5:06-CV-742
Gwin, J.

was provided "with a priority interest in the secured property subject, only, to the first security interest granted to Landlord's lender . . . and the replacement Permanent Mortgage Financing."

3.  Breach and Damages

Finally, Defendant argues that Plaintiff failed to establish any breach of the anti-assignment provision of the Master Lease Agreement.  Defendant posits that Section 322(1) of the Second Restatement of Contracts establishes that a contract's general prohibition against assignment of the contract should be construed as preventing the assignment of contractual *duties*, not contractual *rights*.  In the instant case, Defendant contends that Section 17.1 of the Master Lease Agreement was intended to ensure Defendant could not unilaterally assign its obligations to perform and comply with the terms of the lease to a third party.  Given that Defendant assigned only its right to repayment of the Security Deposit and not any of its contractual duties under the Master Lease Agreement, Envirotest argues that Section 17.1 is inapplicable.

The Court disagrees.  The Supreme Court of Ohio recently described three exceptions to the general rule permitting assignment of contract rights regardless of the presence of anti-assignment provisions: (1) if there is clear contractual language prohibiting assignment; (2) if the assignment materially changes the duty of the obligor, materially increases the insurer's burden or risk under the contract, materially impairs the insurer's chance of securing a return on performance, or materially reduces the contract's value; and (3) if the assignment is forbidden by statute or public policy.  *Pilkington*, 112 Ohio St. 3d at 488.

The assignment at issue in the instant case is arguably prohibited by two independent exceptions to the general rule permitting assignment of contractual rights.  First, the contract

-26-

Case No. 5:06-CV-742
Gwin, J.

contains language that suggests the parties intended to prohibit the assignment.  The pertinent

language of Section 17.1 states the "Tenant agrees not to assign this Lease, in whole or in part."

This language exceeds the traditional provision against assignment of "the contract" discussed in

*Touche*, 854 F.2d at 1234 ("no other assignment"); *Cedar Point Apartments*, 693 F.2d at 753 ("'right

to assign this Agreement'"); *Erwin*, 468 F.2d at 1297 ("This license is assignable"); RESTATEMENT

(SECOND) OF CONTRACTS § 322(1) ("'the contract'"); and CORBIN ON CONTRACTS § 872 ("the

'contract'").  In *Cedar Point Apartments*, the Court explicitly noted that the contract language

evinced no intent "that the restrictions contained in the paragraph apply to assignment of the

purchaser's rights under the contracts."  693 F.2d at 753.  In contrast, the contract provision in *Riley*

stated, "Subcontractor shall not assign its rights or delegate its responsibilities under this

Agreement."  36 Fed. Appx. at 194-95.

Although the language employed by the parties in Section 17.1 of the Master Lease

Agreement does not reach the level of specificity found in *Riley*, the phrase "in whole or in part"

demonstrates some intent that neither contractual obligations nor contractual rights arising from any

subsection of the lease could be assigned to a third party.  The parties' intent is further illustrated

by the testimony of McDara Folan, former General Counsel of Allen Group (parent of MART), who

executed the assignment on behalf of both MARTA and Allen.  Folan admitted that the Security

Deposit discussed in Section 49 of the Master Lease Agreement was subject to the anti-assignment

provisions contained in Section 17.  Further, Section 17.1 explicitly states that the Tenant is the

party bound by the anti-assignment provision.  As such, the general rule of interpretation is

inapplicable to the instant case.  *Riley*, 36 Fed. Appx. at 196 ("If the contract shows an intent by the

parties to limit both delegations of duties and assignment of rights, and specifically states who is

-27-

Case No. 5:06-CV-742
Gwin, J.

bound by the assignment prohibition, then the interpretive default rules are inapplicable.").

CORBIN ON CONTRACTS § 872 provides the following illustrative example:

if a building contract provides that the builder shall not assign the contract, it is almost certain that the parties intend that he shall not delegate supervision of the work wholly to another, and leave the job himself.  In the absence of very apt words to the contrary, they do not intend that the builder shall not assign his right to instalments of the price as they fall due.  It may be of great importance to have the personal supervision of the builder; but it is of much less importance to whose hands the money is to be paid.  If the owner desired to deprive the builder of the power to assign his right to the money, he would have said that the builder's right to the money shall not be assigned, not that the builder shall not assign the 'contract.'

In the instant case, Defendant's obligation to perform under the contract and Defendant's right to recover repayment of the Security Deposit were both of significant import to the plaintiff.  Indeed, the assignment provision and the peculiar incentive structure established by the Master Lease Agreement were specifically negotiated between the parties.  As such, the Tenant agreed "not to assign this Lease, in whole or in part."  Section 17.1 contains language prohibiting assignment of both contractual rights and duties and preventing the application of traditional rules of interpretation governing general anti-assignment provisions.  Therefore, the Court rejects Defendant's motion for summary judgment on this issue.

The fact that the assignment arguably  "materially increases the insurer's burden or risk under the contract, materially impairs the insurer's chance of securing a return on performance, or materially reduces the contract's value" represents the second independent exception triggered by the circumstances of the instant case to the rule permitting assignment of contractual rights. *Pilkington*, 112 Ohio St. 3d at 488.  The parties explicitly linked repayment of the Security Deposit to the condition of the E-Check stations through the September 6, 1994, Letter Agreement.  The Letter Agreement established that the Security Deposit would be repaid "upon the first occurrence

-28-

Case No. 5:06-CV-742
Gwin, J.

of one of the following events: 1. Proceeds from the sale of the Project (property). 2. From the NET

proceeds of any new lease entered into for the Project (property)."

As such, the Letter Agreement provided additional incentive for Defendant to faithfully

comply with the negotiated terms of the Master Lease Agreement.  Plaintiff properly notes, "[s]ince

payment of the Security Deposit was tied directly to the availability of funds upon a release, sale or

refinancing, the provision ensured that the landlord and tenant would each have an economic interest

in expeditiously re-leasing, selling or refinancing the properties."  By design, maintaining the

premises in good condition directly benefitted Defendant by permitting the expeditious transfer of

property to a new user and ensuring rapid repayment of the Security Deposit.  By assigning  the

Security Deposit to Allen, Defendant also assigned the additional economic incentive negotiated by

the parties for Defendant to comply with its maintenance obligations.

Given the unique circumstances of the contractual relationship between the parties, assigning

the Security Deposit entailed more than assigning a mere contractual right.  Instead, the right to

repayment of the Security Deposit was inextricably intertwined with Defendant's duties to perform

other contractual obligations.  In this manner, the instant case is easily distinguishable from *Touche*

and *Cedar Point Apartments* where the assignments did not interfere with parties' potential

performance of contractual obligations or the negotiated balance of economic incentives.  854 F.2d

at 1234 ("So long as the assignment does not interfere with the parties' rights to performance, the

assignment should be permitted"); 693 F.2d at 753 ("No material change in the sellers' duty to

convey title to the realty or chance of receiving return performance occurred by these assignments

of Nicholson's rights as purchaser under the contracts.").

Similarly, the instant case is distinguishable from the facts in *Pilkington*.  The *Pilkington*

-29-

Case No. 5:06-CV-742
Gwin, J.

court described how "[i]nsurance contracts receive unique treatment post-loss." 112 Ohio St. 3d at

489.  However, the instant case involves a property lease, not an insurance contract.  Additionally,

Defendant's assignment took place prior to the alleged injury, given that all previous claims against

MARTA were subsumed in the promise to perform "all Work not yet completed" contained within

the Settlement Agreement.  Finally, the *Pilkington* court arrived at different conclusions regarding

the assignment of the right to indemnify as opposed to the assignment of the right to defend.  *See*

*id.* at 495 (Pfeifer, J., concurring in part and dissenting in part) ("[A]ssignment before loss involves

a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a

money claim.").  As such, the *Pilkington* holding has no bearing on the instant case.

Finally, Defendant makes a half-hearted argument that Plaintiff failed to establish whether

any alleged breach of the anti-assignment provision caused actual damage to OEDLP.  Plaintiff

argues that the alleged breach of the anti-assignment provision upset the balance of economic

incentives generated by the Master Lease Agreement, materially increased Plaintiff's burden and

risk under the contract; materially impaired Plaintiff's chance of securing a return on performance;

and materially reduced the value of the Master Lease Agreement.  *See Pilkington*, 112 Ohio St. 3d

at 488.  As such, Plaintiff successfully presents a genuine issue of material fact as to whether

Defendant's breach of Section 17.1 proximately caused damages that include unpaid rent,

maintenance costs, marketing fees, taxes and security costs.

Additionally, since (1) the Letter Agreement conditions repayment of the Security Deposit

upon the re-lease or resale of the property; (2) the Security Deposit is non-recourse as to OEDLP,

except as secured by the property; and (3) Defendant allegedly failed to maintain the premises in a

fashion that would permit re-lease or resale, Defendant's alleged breach of the anti-assignment

Case No. 5:06-CV-742
Gwin, J.

provision has arguably subjected Plaintiff to the Allen litigation, while leaving Plaintiff with no capacity to resolve the dispute of its own accord.  Regardless of whether Allen's claims against OEDLP have merit, OEDLP's ability to end the litigation is triggered by the re-lease or resale of property, an occurrence allegedly prevented by Defendant's breach of its maintenance obligations. Therefore, Plaintiff presents an additional issue of material fact as to whether Defendant's alleged breach of the anti-assignment provision, in conjunction with Defendant's alleged breach of the duty to maintain the properties in good condition, proximately caused Plaintiff's attorneys' fees in the Allen litigation.

## IV.  Conclusion

In conclusion, Plaintiff successfully presents numerous issues of material fact sufficient to warrant trial.  For all the aforementioned reasons, the Court hereby **DENIES** Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.


Dated: March 14, 2007                    s/          *James S. Gwin*
                                         JAMES S. GWIN
                                         UNITED STATES DISTRICT JUDGE

-31-